# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

MARC A. OHMANN,

      Debtor.

                                          Chapter 7
                                          BKY 18-40890-KHS

JULIA A. CHRISTIANS,

      Plaintiff,

v.                                          ADV 18-04139-KHS

MARC AARON OHMANN, and
REINHART G. OHMANN,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

At Minneapolis, Minnesota, August 22, 2019.

This adversary proceeding came on for trial on March 19, 2019, to determine whether the balance of a jointly owned E*Trade account reported on the debtor's bankruptcy schedules is property of the estate and subject to turnover. Ralph Mitchell appeared on behalf of Plaintiff and Michael Hoverson appeared on behalf of Defendants. On March 20, 2019, the Court ordered supplemental post-trial briefing.[1] Responses were filed and the matter was submitted for decision on May 21, 2019.

---

[1] Dkts. 29, 35.

1

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 08/22/2019
Lori Vosejpka, Clerk, by LH

This Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C. §§ 157(b)(1) & 1334, Fed. R. Bankr. P. 7001, and Local Rule 1070–1.  This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (E), & (O).  Venue in this Court is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

For the reasons stated below, the Court finds in favor of Defendants.

## THE PARTIES

The Plaintiff, Julia A. Christians, is the Chapter 7 Trustee and a resident of the State of

Minnesota ("Plaintiff").

Defendant Marc Ohmann is a resident of the State of Minnesota and the debtor in this

bankruptcy case ("Marc").

Defendant Reinhardt Ohmann ("Reinhardt") is a resident of the State of Minnesota and is

the debtor's father (collectively with Marc, the "Defendants").[2]

## WITNESSES

The following witnesses provided testimony at the trial:

- Marc Aaron Ohmann – Marc Ohmann is a Defendant and the debtor in the
  Chapter 7 bankruptcy case.  Marc testified about, among other items, the
  E*Trade account, an oral agreement between Reinhardt and himself regarding
  the handling of the E*Trade account, the loans he received from Reinhardt
  over the years, and his bankruptcy petition and schedules.  He was a credible
  witness.

- Reinhardt G. Ohmann – Reinhardt Ohmann is a Defendant and Marc's father.
  Before retirement, Reinhardt was employed as an accountant by the State of

---

[2] The caption for this adversary proceeding incorrectly gives Reinhardt's first name as "Reinhart."

Minnesota.[3]  Reinhardt provided testimony about the same topics as Marc.

Reinhardt also testified about his intent for the E*Trade account.  He was a

credible witness.

## FACTS

The following facts were either stipulated to by the parties, derived from the submitted

documentary evidence, or otherwise determined by the Court.

### <u>Case and Background Information</u>

1.      Marc filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy

Code on March 26, 2018.

2.      Plaintiff was appointed Chapter 7 Trustee of Marc's bankruptcy estate.

3.      Marc's bankruptcy schedules list an E*Trade Securities brokerage account (the

"Account") described as follows:  E*Trade Securities, LLC brokerage account *4658 held

jointly with my father.  He made all contributions to the account and owns the funds on deposit.

I have not deposited any funds or assets and the value of my interest is zero.  Balance is

approximately $103,690.30.[4]

4.      Marc listed the value of his interest in the Account as $1.00.[5]

5.      On Schedule C, Marc claimed his joint legal title to the Account as 100% exempt

under 11 U.S.C. § 523(d)(5).[6]

6.      Marc scheduled an unsecured debt to Reinhardt in the amount of $185,911.00 for

a loan incurred on January 2, 2004.[7]

---

[3] Trial Tr., 96:1–7.
[4] Ex. 1 at Bates No. 14.  Plaintiff's exhibits are Bates stamped.  Defendants' exhibits are not.  For the remainder of the opinion, the Court will cite to the relevant Bates number for Plaintiff's exhibits without the "Bates No." designation used in this footnote.
[5] *Id*.
[6] *Id*. at 20.
[7] *Id*. at 32.

7.      Marc scheduled another unsecured debt to Reinhardt in the amount of $80,000.00 for a loan incurred on May 16, 2016.[8]

8.      Marc did not amend his bankruptcy petition or schedules.

9.      Plaintiff convened the Section 341 meeting of creditors on April 23, 2018.

10.     On September 24, 2018, Plaintiff filed this adversary proceeding.  Count I of Plaintiff's Complaint seeks a declaratory judgment that the balance of the Account is property of the estate.  Should the Court find that some or all of the balance in the Account is estate property, Count II of the Complaint seeks an order requiring the balance in the Account as of the petition date to be turned over to Plaintiff.

11.     The Court denied Plaintiff's Motion for Summary Judgment on January 29, 2019.[9]

12.     Marc received a discharge in his Chapter 7 case on June 25, 2018.[10]  The case remains open.

**E*Trade Account Application**

13.     On December 12, 1988, Reinhardt completed and executed a Personal Account Application for a margin account with E*Trade Securities, Inc.[11] ("E*Trade") (the "Application").[12]

14.     The account type indicated on the Application is "Joint–rights of survivorship."[13]

15.     A transfer on death ("TOD") account was not given as an option.[14]

---

[8] *Id.*
[9] Dkt. 15.
[10] Case No. 18-40890, Dkt. 14.
[11] Now known as E*Trade Securities, LLC.
[12] Ex. A, Ex. 5.
[13] Ex. A at 1.
[14] *Id.*

16.      Marc is listed as the account holder and Reinhardt as the co-account holder.[15]

17.      At the time the Account was created, Marc was a student living with his parents and Reinhardt was retired.[16]

18.      Reinhardt's address is the one provided on the Application.[17]

19.      Both Defendants provided their social security numbers on the Application.[18]

20.      In the Account Information Profile section of the Application, Marc's approximate annual income, liquid net worth, and total net worth is provided, not Reinhardt's.[19]

21.      When asked how many signatures would be required to process checks, Defendants selected the option for one.[20]

22.      Both Defendants signed the Application.[21]

23.      E*Trade opened the Account as requested by Defendants.

**Customer Agreement**

24.      In the Application, Defendants acknowledged they received, read, and agreed to be bound by the terms and conditions set forth in the E*Trade Customer Agreement (the "Customer Agreement").[22]

25.      The parties stipulated that the most recent version of the Customer Agreement, obtained by Defendants from the E*Trade website, applies to the Account despite the Customer Agreement's effective date of October 2018.[23]

---

[15] *Id*.
[16] *Id*.
[17] *Id*.; *see* Trial Tr., 95:5–8.
[18] Ex. A at 1.
[19] *Id*.
[20] *Id.* at 2.
[21] *Id*.
[22] *Id*.
[23] Ex. 6.  Defendants now attempt to cast doubt on whether the Customer Agreement governed the Account at any relevant time in this adversary.  Defs.' Post-Trial Br., Dkt. 41 at 22.  Defendants, however, previously stipulated to the Customer Agreement's application.  Dkt. 24.

5

26.    The Customer Agreement governs Defendants' relationship with E*Trade.[24]

27.    Under the Customer Agreement, both Defendants have equal access to the funds in the Account and check writing privileges.[25]  Checks for the Account were originally made available through United Missouri Bank.[26]

28.    Under the Customer Agreement, both Defendants have full authority to independently take any action on behalf of the Account, including the purchase and sale of securities and the ability to withdraw all the funds from the Account.[27]

**Account Components**

29.    There are two components to the Account—a Securities Investment Account and a Sweep Deposit Account.[28]

30.    Securities products and services are offered by E*Trade Securities LLC, member FINRA/SIPC.[29]

31.    The Sweep Deposit Account is a bank deposit account with E*Trade Bank or its subsidiaries, a federal savings bank, member FDIC.[30]

**Marc's Personal Financial Statement and Tax Returns**

32.    On April 20, 2017, Marc submitted a personal financial statement to Anchor Bank in support of a small business loan (the "Personal Financial Statement").[31]

---

[24] Ex. 6 at 90.
[25] *Id*. at 92, 94; *see* Ex. 4 at 80.
[26] *See* Exs. FF at 3, GG at 3.
[27] Ex. 6 at 92.
[28] *Id.* at 96, 112; *e.g.*, Exs. WW at 3, XX.
[29] Ex. WW at 3, Ex. 6 at 96, 112.
[30] Exs. WW at 3, XX, Ex. 6 at 96, 112.
[31] Ex. 15.

33.     The asset column of the Personal Financial Statement lists marketable securities worth $80,000.[32]  Schedule C of the Personal Financial Statement describes the securities as "Various ETrade."[33]

34.     When Marc submitted the Personal Financial Statement, or shortly thereafter, he provided Anchor Bank with a copy of an E*Trade monthly account statement showing that the Account was jointly owned with Reinhardt.[34]

35.     Marc reported the capital gains, losses, and dividends from the Account on his personal tax returns.[35]

**Account Deposits and Withdrawals**

36.     Reinhardt testified about the deposits and withdrawals made to and from the Account over the years.[36]

37.     After establishing a foundation through Reinhardt's testimony, Defendants offered a Summary of Deposits and Withdrawals (the "Summary") into evidence.[37]

38.     Plaintiff did not object to the Summary's inflow and outflow figures.[38]

39.     Plaintiff's limited objection to the Summary's admission into evidence was the description of certain line items as "loans" or "loan payments."[39]

---

[32] *Id*. at 346.
[33] *Id*. at 347.
[34] Trial Tr., 77:24–78:21.  Marc testified that he obtained the account statement from Reinhardt for purposes of submitting it with his Personal Financial Statement.  *Id*.  Marc provided Anchor Bank with the monthly account statement for March 2017.  *Id*.; *see* Ex. WW.
[35] Exs. 9–14.  Plaintiff's post-trial brief alludes throughout that Marc may have committed bank fraud in connection with the Personal Financial Statement and that Defendants may have committed tax fraud based on how the capital gains, losses, and dividends were reported.  *See generally* Pl.'s Post-Trial Br., Dkt 39.  These matters are not before the Court and are relevant to this adversary proceeding only for purposes of assessing Defendants' credibility. Despite the alleged bank and tax fraud, the Court found the witnesses to be credible.
[36] Trial Tr., 177:4–182:13.
[37] *Id*. at 182:11–13; *see* Ex. UU.
[38] Trial Tr., 182:14–18.
[39] *Id*. at 182:14–23.

40.     The Court admitted the Summary with Plaintiff's objection noted in the record.[40]

41.     The Summary reads as follows:

**Summary of Deposits and Withdrawls**
**Etrade JTWROS xxxx-4658**

| Date | Inflow | Outflow | |
|---|---|---|---|
| 12/16/1998 | $3,000.00 | | Deposit from Reinhardt, source 1st US Bank NA Credit Card |
| 1/5/1999 | $20,000.00 | | Deposit from Reinhardt, source US Bank |
| 7/23/2001 | $31,540.29 | | Deposit from Reinhardt, source loan payment by Marc (see summary loan ledger) |
| 8/28/2001 | | $5,900.00 | Check 1001 loan to Marc (see summary loan ledger) |
| 11/27/2001 | | $1,000.00 | Check 1002 loan to Marc (see summary loan ledger) |
| 5/28/2002 | $30,000.00 | | Deposit from Reinhardt |
| 6/25/2002 | | $15,000.00 | Check 1003 loan to Marc (see summary loan ledger) |
| 10/24/2002 | | $300.00 | Check 1004 loan to Marc (see summary loan ledger) |
| 11/27/2002 | | $300.00 | Check 1005 loan to Marc (see summary loan ledger) |
| 1/2/2003 | | $3,500.00 | Check 1006 loan to Marc (see summary loan ledger) |
| 6/10/2003 | | $589.20 | Check 1007 loan to Marc (see summary loan ledger) |
| 6/19/2003 | | $500.00 | Check 1008 loan to Marc (see summary loan ledger) |
| 4/21/2004 | | $17,834.34 | Check 1010 loan to Marc (see summary loan ledger) |
| 5/28/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 6/15/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 6/30/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 7/15/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 7/30/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 8/13/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 8/31/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 2/25/2016 | | $40,000.00 | Reinhardt DSI share purchase |
| 5/24/2016 | | $80,000.00 | Loan to Marc for DSI share purchase (see summary loan ledger) |

[41]

42.     There were three additional withdrawals from the Account that were not included on the Summary:  $715.00 on September 19, 2007, $12,160.00 on April 29, 2011, and $2,733.00 on April 24, 2012.[42]

43.     Withdrawals from the Account were all made from the Account's checkbook.[43]

---

[40] *Id*. at 182:14–183:11.

[41] Ex. UU.

[42] Trial Tr., 224:6–230:8; *see* Exs. YY, ZZ, AAA.  Defendants' exhibits evidencing the three withdrawals were received without objection.  Marc testified that the withdrawal for $715.00 was a loan from Reinhardt to himself. Trial Tr., 226:5–25.  Marc testified that the withdrawals for $12,160.00 and $2,733.00 were payments by Reinhardt to reimburse Marc for federal and state taxes on the Account.  *Id*. at 227:12–230:2.

[43] Exs. EE, FF, GG, II, JJ, KK, LL, MM, NN, SS, TT, YY, ZZ, AAA.

44.    Reinhardt personally wrote the checks, except for two checks written by and for Marc for loans at Reinhardt's house, in Reinhardt's presence, and with Reinhardt's express permission.[44]

## DISCUSSION

The primary issue here is whether the Minnesota Multi-Party Accounts Act ("MPAA") applies to the type of multi-component brokerage account in this adversary proceeding.[45]  If the MPAA does not apply, as asserted by Plaintiff, then the Court must turn to common law to determine ownership of the funds in the Account, which according to Plaintiff would mean the funds belong to Marc.  Defendants argue that the MPAA does apply and that Marc has no ownership interest over the funds in the Account.

## A.    MPAA

The MPAA is a uniform act that provides that during the lifetime of all parties, a joint account belongs "to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."[46]  Even where a joint account holder has the power to withdraw funds he did not contribute to the account, a joint account holder does not, without evidence of contrary intent, own the funds contributed by another party.[47]

---

[44] Trial Tr., 165:24–169:7; *see* Exs. FF, GG.

[45] Minn. Stat. §§ 524.6-201–524.6-216.

[46] *Id.* at § 524.6-203(a); *see Enright v. Lehmann*, 735 N.W.2d 326, 330, 332–33 (Minn. 2007).  In 1994, the Minnesota legislature renumbered the MPAA to make it part of the Probate Code.  *Enright*, 735 N.W.2d at 330. Although Minnesota's MPAA was not initially enacted as part of the Uniform Probate Code, the Minnesota Supreme Court found that the decision to move it there "indicates the legislature's desire that Minnesota courts interpret the MPAA consistently with those of other states."  *Id.* at 332–33.

[47] *Id.* at 334–35; *see Dooner v. Yuen*, No. 16-cv-1939 (RHK/SER), 2017 WL 3172986, at *2 (D. Minn. July 25, 2017) (providing that under the MPAA, the right to withdraw funds alone does not create an ownership right over such funds).

The MPAA defines an "account" as "a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, savings account, certificate of deposit, share account <u>and other like arrangement</u>."[48]  A "financial institution" is defined as "any organization authorized to do business under state or federal laws relating to financial institutions, including, <u>without limitation</u>, banks and trust companies, savings banks, savings associations, and credit unions."[49]

## B.    <u>Applicability of the MPAA</u>

In support of her position that the MPAA does not apply to the Account, Plaintiff cites two cases decided by the Minnesota Court of Appeals.  In *Berg v. D.D.M.*, the disputed ownership concerned a Dean Witter brokerage account jointly owned by the decedent and his surviving spouse.[50]  The Court of Appeals held that the brokerage account was not a multiple-party account within the meaning of the MPAA.[51]  It is unclear from the decision whether the brokerage account also included a deposit account component similar to the Account in this adversary or whether it was strictly a securities account.[52]

The second case cited by Plaintiff, *In re Setterberg*, is unpublished and cites to *Berg* for support.[53]  In that case, the court determined that jointly held stock was not a contract of deposit of funds and was not deposited with or held by a financial institution.[54]

---

[48] Minn. Stat. § 524.6-201, subd. 2 (emphasis added).

[49] *Id*. at subd. 3 (emphasis added).

[50] 603 N.W.2d 361 (Minn. Ct. App. 1999).  *Berg* addressed whether funds in a joint brokerage account were available to pay child support to the extent of the decedent's beneficial interest in the joint account under Minn. Stat. § 524.6-207.

[51] *Id*. at 364.  The Court of Appeals determined that investments in stocks with the Dean Witter brokerage firm was not the type of deposit of funds in a financial institution contemplated by the MPAA.  *Id.*

[52] In making its decision, the *Berg* court relied on two Idaho Supreme Court cases.  *Ashe v. Hurt* (*In re Ashe*), 787 P.2d 252 (Idaho 1990); *Smith v. Bogert* (*In re Bogert*), 531 P.2d 1167 (Idaho 1975).  The *Berg* court noted the Idaho Supreme Court's recognition of "the evolving nature of financial institutions" and that the Idaho decisions "did not categorically preclude all future litigants from demonstrating that stock brokerage firms may be found to be financial institutions." *Berg*, 603 N.W.2d at 364 n.1.

[53] *In re Setterberg*, No. C8-00-1546, 2001 WL 32848, at *2 (Minn. Ct. App. Jan. 16, 2001).

[54] *Id.* at *1–2.

Here, Defendants assert that the Account is covered by the MPAA for two main reasons. First, the Account, with its sweep deposit account component, is an "other like arrangement" under the MPAA's broad definition of an "account."[55]  Second, E*Trade and E*Trade Bank are "financial institutions" under the MPAA, pursuant to the non-exhaustive, "without limitation" definition.[56]  In support, Defendants rely on the Minnesota Supreme Court's decision in *Enright v. Lehmann*.[57]

In *Enright*, the Minnesota Supreme Court held that under the unambiguous language of the MPAA, where one party contributes all the funds in a joint account, a creditor cannot garnish the account to satisfy a debt against the non-contributing party absent clear and convincing evidence that the contributing party intended to confer ownership of the funds on the debtor.[58] The account at issue was a joint bank account and all the funds in the account were deposited by the debtor's spouse.[59]

In discussing the MPAA in *Enright*, the Minnesota Supreme Court stated that the purpose of the MPAA was to establish a clear standard for determining ownership of funds held in joint accounts and to provide protection for assets in a joint account from creditors of either party.[60]  Further, the court provided that the MPAA was intended to replace common law as the appropriate mechanism for determining ownership of funds in joint accounts.[61]

---

[55] Minn. Stat. § 524.6-201, subd. 2.
[56] *Id*. at subd. 3.
[57] 735 N.W.2d 326 (Minn. 2007).
[58] *Id*. at 331.  The *Enright* court rejected the creditor's argument that because the debtor had the right to withdraw all of the funds, the creditor became subrogated to that right.  *Id*. at 334–35 ("Even where a joint account holder has the power to withdraw funds he did not contribute, he exercises dominion over those funds only with the consent of the contributing party."); *see Dooner*, 2017 WL 3172986, at *2–3.  Plaintiff advances a similar argument in this adversary.
[59] *Enright*, 735 N.W.2d at 329, 336.
[60] *Id*. at 332.
[61] *Id*. at 331–32.

The Minnesota Supreme Court did not directly address *Berg*, even though *Enright* was decided several years later. In *Enright*, the Minnesota Supreme Court discussed, and cited with approval, *Deutsch, Larrimore & Farnish, P.C. v. Johnson*, a case decided by the Pennsylvania Supreme Court.[62] The *Deutsch* case cited *Berg*, but concluded that a brokerage account fell under Pennsylvania's version of the Multi-Party Accounts Act.[63] The Pennsylvania Supreme Court reasoned that joint brokerage accounts are often used as financial planning vehicles and the benefit of such accounts would be lost if creditors of either party could reach any of the funds within the account regardless of who deposited them.[64] The brokerage account was found to be so similar to the definition's enumerated types of accounts as to fall under the "share account or other like arrangement" language of Pennsylvania's Multi-Party Accounts Act.[65]

Here, the Court adopts the reasoning of the Minnesota and Pennsylvania Supreme Courts and determines that the MPAA applies to the Account. The Account meets the broad definitions for an "account" and "financial institution." Further, the policy considerations stated in the *Enright* decision support this result. We turn to the burden of proof under the MPAA.

## C.   Burden of Proof

Under the MPAA, the owners of a joint account bear the initial burden of proving net contributions to show that funds in the account do not belong to the debtor.[66] Absent proof of net contributions, Minnesota courts apply a rebuttable presumption that a debtor owns all the funds in a joint account.[67] Once net contributions are shown, the burden shifts to the creditor to

---

[62] *Id.* at 332; *Deutsch*, 848 A.2d 137, 140–43 (Pa. 2004).
[63] *Deutsch*, 848 A.2d at 140–41. The *Deutsch* court held that multi-service brokerage accounts were similar to share accounts and at least fell within the broad "other like arrangements" language in the definition of an "account." *Id.* at 141. The court also found the brokerage firm Morgan Stanley Dean Witter fit within the broad definition of a "financial institution." *Id.* at 142.
[64] *Id.* at 142–43.
[65] *Id.* at 141–42.
[66] *Savig v. First Nat'l Bank of Omaha*, 781 N.W.2d 335, 341–46 (Minn. 2010).
[67] *Savig*, 781 N.W.2d at 347–48.

prove by clear and convincing evidence that the non-debtor depositor intended to confer

ownership of the funds on the debtor.[68]  The standard of clear and convincing evidence is shown

"where the truth of the facts asserted is highly probable."[69]

### D.     Net Contributions

The "net contribution" of a party to a joint account is "the sum of all deposits thereto

made <u>by or for the party</u>, less all withdrawals made <u>by or for the party which have not been paid

to or applied to the use of any other party</u>, plus a pro rata share of any interest or dividends

included in the current balance."[70]

In calculating net contributions, the Court must first determine whether the payments to

and from Marc were loans.  At trial, Defendants testified about the deposits and withdrawals

from the Account.  Defendants introduced the Summary, monthly account statements showing

the deposits and withdrawals, and other documents to prove net contributions.[71]  In addition,

Defendants testified about a series of loans made by Reinhardt to Marc and Marc's business over

the years, some of which were made with funds withdrawn from the Account.  Defendants

introduced a summary loan ledger for the loans between Reinhardt and Marc and other

documents, primarily consisting of slips of paper saved by Reinhardt and stored in his attic, as

evidence for the loans.[72]  Plaintiff provided no evidence that the checks paid to Marc did not

constitute loans nor that the funds deposited by Marc were not repayments of those loans.

Plaintiff attempts to cast doubt on Defendants' credibility due to the loan arrangement's lack of

formality and because Marc was reporting the Account's gains, losses, and dividends on his

---

[68] Minn. Stat. § 524.6-203; *Enright*, 735 N.W.2d at 328.
[69] *Christie v. Christie*, 911 N.W.2d 833, 838–39 (Minn. 2018).
[70] Minn. Stat. § 524.6-201, subd. 6 (emphasis added).
[71] Ex. UU; *see* Exs. B, BB–TT, YY, ZZ, AAA.
[72] Ex. VV; *see* Exs. D–Z, AA.  The summary loan ledger was offered into evidence with no objection.  Trial Tr., 259:3–8.

13

taxes.  While these considerations weigh in favor of Plaintiff's position, the Court is not

persuaded that Defendants were not credible.  Rather, Defendants produced many slips of paper

evidencing the loans and their testimony was credible.[73]  Further, given the family relationship

and Marc's age when the loans began, the informality is not surprising.[74]

The Court finds that the funds withdrawn and paid to Marc were loans and the payments

deposited from Marc were loan repayments:

**Summary of Deposits and Withdrawls**
**Etrade JTWROS xxxx-4658**

| Date | Inflow | Outflow | |
|------|--------|---------|---|
| 12/16/1998 | $3,000.00 | | Deposit from Reinhardt, source 1st US Bank NA Credit Card |
| 1/5/1999 | $20,000.00 | | Deposit from Reinhardt, source US Bank |
| 7/23/2001 | $31,540.29 | | Deposit from Reinhardt, source loan payment by Marc (see summary loan ledger) |
| 8/28/2001 | | $5,900.00 | Check 1001 loan to Marc (see summary loan ledger) |
| 11/27/2001 | | $1,000.00 | Check 1002 loan to Marc (see summary loan ledger) |
| 5/28/2002 | $30,000.00 | | Deposit from Reinhardt |
| 6/25/2002 | | $15,000.00 | Check 1003 loan to Marc (see summary loan ledger) |
| 10/24/2002 | | $300.00 | Check 1004 loan to Marc (see summary loan ledger) |
| 11/27/2002 | | $300.00 | Check 1005 loan to Marc (see summary loan ledger) |
| 1/2/2003 | | $3,500.00 | Check 1006 loan to Marc (see summary loan ledger) |
| 6/10/2003 | | $589.20 | Check 1007 loan to Marc (see summary loan ledger) |
| 6/19/2003 | | $500.00 | Check 1008 loan to Marc (see summary loan ledger) |
| 4/21/2004 | | $17,834.34 | Check 1010 loan to Marc (see summary loan ledger) |
| 5/28/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 6/15/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 6/30/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 7/15/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 7/30/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 8/13/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 8/31/2004 | $600.00 | | Deposit, source loan payment by Marc (see summary loan ledger) |
| 2/25/2016 | | $40,000.00 | Reinhardt DSI share purchase |
| 5/24/2016 | | $80,000.00 | Loan to Marc for DSI share purchase (see summary loan ledger) [75] |

At first glance, the Summary of the withdrawals and deposits would suggest that

Reinhardt's net contribution to the Account is negative and Marc's net contribution to the

Account is positive.  The plain language of the MPAA, however, makes it clear that a party's

---

[73] Ex. VV; *see* Exs. D–Z, AA.
[74] While the Court is troubled by Defendants' apparent intention to avoid paying the correct amount of taxes, this does not support a finding that the moneys paid to and from Marc were not loans and loan repayments.
[75] Ex. UU.

"net contribution" includes all deposits made <u>by or for a party, as well as all withdrawals made</u> <u>by or for</u> a party which have not been paid to or applied to the use of another.[76]

The series of seven direct deposits of $600.00 each from May through August 2004, via payroll deductions from Marc's then employer, were made <u>for</u> Reinhardt as they constituted loan repayments from Marc to Reinhardt and were made in the manner directed by Reinhardt.[77] Defendants also testified that a deposit of $31,540.29 on July 23, 2001, funds received by Marc from a wrongful death lawsuit, was a loan repayment from Marc to Reinhardt.[78]  Excluding any equity, interest, and dividends, Reinhardt's net contribution is therefore $33,847.29.

Withdrawals under the MPAA include those made <u>for</u> the party—who wrote the check is immaterial.[79]  Thus, the eleven withdrawals from the Account totaling $125,638.54 are used to compute Marc's net contribution.[80]  In calculating net contributions, the Court finds that there were no deposits into the Account attributable to Marc.  Excluding any equity, interest, and dividends, Marc's net contribution is therefore ($125,638.54).

Plaintiff argues that Defendants did not meet their burden of establishing their respective net contributions because they failed to introduce all of the monthly account statements for the nearly twenty-year period and because Reinhardt did not make all of the deposits in the Account.[81]  For the reasons already stated, the Court disagrees and finds that Defendants have met their burden to show net contributions to the Account.

---

[76] Minn. Stat. § 524.6-201, subd. 6 (emphasis added).
[77] Trial Tr., 160:18–161:6, 234:14–235:17.  Exs. OO–RR
[78] Trial Tr., 155:17–156:13, 233:5–24; Ex. DD. The check was made out to Marc, endorsed by Marc, and deposited by Reinhardt.
[79] Minn. Stat. 524.6-201, subd. 6.  Further, the majority of the withdrawals made by Reinhardt were either paid to or applied to the use of any other party—here, Marc.  *Id.*
[80] *See generally* Ex. UU.
[81] Reinhardt testified that he produced all the monthly account statements to Plaintiff in discovery.  Trial Tr., 135:8–22.

Case 18-04139   Doc 44   Filed 08/22/19   Entered 08/22/19 11:13:15   Desc Main
Document      Page 16 of 18

As a final point, the discrepancy between Defendants' net contributions and the balance in the Account on the petition date is explained by the equity and interest built up over the years and any dividends included in the balance. Funds in a joint account belong to the parties in proportion to their net contributions, which includes a pro rata share of any interest of dividends included in the current balance.[82] Given Marc's negative net contribution, he has no ownership interest in the funds in the Account.[83]

## E.    Intent

Having established net contributions to the Account, the burden now falls on Plaintiff to show by clear and convincing evidence that Reinhardt intended to confer ownership of the funds in the Account to Marc in order to prevail in this adversary. To meet her burden, Plaintiff argues that Defendants' informal and incomplete evidence fails to show that the withdrawals from the Account were loans to Marc.[84] As additional support, Plaintiff cites Marc's name as the account holder on the Application, that only one signature is required to write checks, that Defendants have equal rights to the Account under the Customer Agreement, Marc's Personal Financial Statement, Marc's tax reporting, and the fact that Defendants did not select a beneficiary TOD designation on the Application.[85] Finally, Plaintiff argues there is no evidence of any alleged oral agreement and mutual understanding between Defendants as to the Account.

The Court disagrees. Throughout this adversary proceeding, Defendants have maintained that the Account was opened as a financial planning tool for Reinhardt.[86] Based on the testimony and documentation, the Court is persuaded that Defendants had an oral agreement and

---

[82] Minn. Stat. §§ 524.6-201, subd.3, 524.6-203(a).
[83] Even if it were possible to conclude that Marc's pro rata share was 100% of any interest or dividends included in the Account's balance on the petition date, Marc's net contribution to the Account would still be negative.
[84] Pl.'s Post-Trial Br., Dkt 39 at 38.
[85] *Id*. at 39–41. A TOD account was not given as an option on the Application. Ex. A at 1, Ex. 5 at 88. Reinhardt testified that he did not know what a TOD account was when he filled out the Application. Trial Tr., 126:17–24.
[86] Trial Tr., 100:17–24, 107:16–108:2, 120:8–11.

mutual understanding about the Account—that all funds in the Account, were to remain solely in Reinhardt's possession, ownership, and control during his lifetime.[87]  Defendants agreed that Reinhardt was the only person permitted to withdraw funds, purchase and sell securities, and close the Account.[88]  Defendants' actions and conduct over the years is consistent with such an oral agreement—the monthly account statements were sent to Reinhardt, the 1099 tax forms for the Account were sent to Reinhardt, Reinhardt kept the Account checkbook in his desk drawer, and Reinhardt was the only one with the password and on-line access credentials for the Account.[89]  Reinhardt personally wrote the checks, except for two checks written by and for Marc for loans at Reinhardt's house, in Reinhardt's presence, and with Reinhardt's express permission.[90]  Although informal, Defendants produced evidence and testimony at trial showing that the withdrawals from the Account were loans to Marc.  Further, Reinhardt testified that he expected to be repaid on the loans and Marc did in fact repay some of the loans.[91]

Plaintiff has failed to meet her burden and has not shown by clear and convincing evidence that Reinhardt intended to confer ownership of the funds in the Account to Marc.

## CONCLUSION

Based on the record and available evidence, the Court decides that Plaintiff has failed to establish that the balance of the Account as of the petition date is property of the estate and subject to turnover.  Under the MPAA, Defendants have proven net contributions to show that the funds in the Account belong solely to Reinhardt.  Plaintiff failed to show by clear and convincing evidence that Reinhardt intended to confer ownership of the funds to Marc.

---

[87] Trial Tr., 28:20–29:21, 46:16–47:7, 119:5–16, 133:21–135:7, 230:10–231:22.
[88] Trial Tr., 133:21–135:7, 230:10–231:22.
[89] Trial Tr., 118:6–14, 135:8–136:23, 232:4–21.
[90] Trial Tr., 165:24–169:7; *see* Exs. FF, GG.
[91] Trial Tr., 50:16–51:10, 112:9–18, 128:24–129:2.

Case 18-04139   Doc 44   Filed 08/22/19   Entered 08/22/19 11:13:15   Desc Main
Document      Page 18 of 18

## CONCLUSIONS OF LAW

1.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

(E), & (O) and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) & 1334.

2.      Venue is proper before this Court under 28 U.S.C. §§ 1408 & 1409.

3.      The MPAA applies to the Account.

4.      Defendants carried their burden of proving net contributions to the Account.

5.      Plaintiff failed to carry her burden of proving a different intent by clear and

convincing evidence.


## ORDER

IT IS ORDERED:  The balance of the Account is not property of the estate and therefore

not subject to turnover.

LET JUDGMENT BE ENTERED ACCORDINGLY.



/e/ Kathleen H. Sanberg
_____
KATHLEEN H. SANBERG
UNITED STATES BANKRUPTCY JUDGE